UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                        :

SANDRA DIAZ,                                                      06-CV-7718 (RLC)

                                                          :

                  Plaintiff,                                 ECF CASE

                                                          :

                      v.

                                                          :

MEMORIAL SLOAN-KETTERING CANCER
CENTER,                                                     :

                 Defendant.                               :

------------------------------------------------------------------ x

## DEFENDANT'S STATEMENT IN COMPLIANCE WITH RULE 56.1

1.    Defendant Memorial Sloan-Kettering Cancer Center (the "Center") is a leading cancer institute. (Dudley Aff. ¶4.)

2.    The Center is committed to treating patients with cancer and conducting research to improve treatment options and develop a potential cure for cancer. (Id.)

3.    The Center maintains a written Equal Employment Opportunity Policy ("EEO Policy") that states, in relevant part, that:

> It is the Center's policy to provide equal opportunity, in accordance with all applicable federal, state and local civil rights laws, to all of its employees and applicants for employment without regard to race, color, religion, gender, age, national origin, marital status, citizenship status, disability, veteran status or sexual orientation of qualified persons consistent with the Center's Affirmative Action Program. (Diaz Dep. 5, Ex. 6.)

4.    The Center takes many steps in furtherance of its commitment to providing a non-discriminatory working environment: it makes the policy known to its employees by posting EEO notices on employee bulletin boards; it distributes copies of its Employee Handbook, which sets forth the EEO Policy, to all employees upon their hire; and it makes the EEO Policy available to all employees online. (Dudley Aff. ¶5.)

5. The Center also utilizes its Employee Relations Department ("Employee Relations") to address complaints of discrimination and to monitor termination decisions. (Id. at ¶6.)

6. The Center maintains an Individual Performance Improvement Policy ("PIP"), which policy addresses employee performance issues through formal warning procedures akin to the procedures provided to employees in a union setting under a collective bargaining agreement. (Diaz Dep. 150-51, Ex. 7.)

7. The PIP provides that, in the sole discretion of the Center and where practicable, the Center will follow certain procedural steps (*e.g.*, counseling, verbal warning, first and then final written warnings) in addressing employee performance issues. (Id.)

8. Section 1.3 of the PIP excludes certain employees from protection under the policy on the theory that certain employees (*e.g.*, management) are expected to understand their duties and responsibilities and to perform them competently without a formal warning process. (Diaz Dep. 150-51, Ex. 7; Palatucci Dep. 41, 62-63.)

9. Specifically excluded from coverage under the PIP are employees, who based upon their salary grade, are covered by the Center's basic retirement plan during their employment. (Diaz Dep. 151-52, Exs. 5, 7.)

10. Employees who are in positions classified at the M8 salary grade and above are covered by the Center's basic retirement plan. (Diaz Dep. 29-30, 152, Ex. 5.) Ms. Diaz's position -- Regional Administrative Manager -- is classified at the M11 salary grade. (Diaz Dep. 60, 154, Ex. 9.)

11.     Because of her high level management role, Ms. Diaz was not entitled to formal warning under the Center's PIP because the PIP was inapplicable to her. (Diaz Dep. 151-52; Palatucci Dep. 62; Lopman Aff. ¶12.)

12.     On April 19, 2004, the Center hired Ms. Diaz as Regional Administrative Manager (also referred to as "Site Manager") at its Westchester regional care facility located in Sleepy Hollow, New York (the "Phelps" facility). (Diaz Dep. 24, 29; Lopman Aff. ¶4.)

13.     Operationally, Phelps is comprised of two practices -- radiation oncology and medical oncology (*i.e.*, chemotherapy) -- with a separate clinical staff servicing each practice. (Lopman Aff. ¶4.)

14.     In her capacity as Site Manager, Ms. Diaz was responsible for overseeing and facilitating the day-to-day administrative operations of the entire facility and had additional responsibilities with respect to the chemotherapy practice. (Diaz Dep. 66; Lopman Aff. ¶5.)

15.     Specifically, Ms. Diaz was responsible for, among other things: (i) collaborating with the facility's clinical staff (*e.g.*, physicians and nurses) to ensure that the operations of the facility ran smoothly and efficiently; (ii) directly overseeing patient scheduling and supervising the administrative employees known as Client Service Representatives ("CSRs") who actually perform patient scheduling; (iii) monitoring all physical aspects of the facility, such as requesting repairs, ensuring adequate telephone coverage and maintaining adequate supplies; (iv) formulating financial and operational goals for the facility; (v) implementing standards and procedures for the facility's operations; and (vi) maintaining regulatory compliance. (Diaz Dep. 66, 72, Ex. 9; Lorant Dep. 12, 44; Palatucci 27; Lopman Aff. ¶5.)

16.     Although they were expected to work collaboratively, there was no reporting or supervisory relationship between Ms. Diaz and any member of the clinical staff. (Diaz Dep. 73-74.)

17.     One of the most critical aspects of Ms. Diaz's responsibilities as Site Manager concerned her ability to effectively manage the chemotherapy patient schedule, which schedule is central to the Center's mission to provide patients with high quality medical care. (Diaz Dep. 67; Lorant Dep. 9-10; Reyes Dep. 25; Palatucci Dep. 15, 17; Lopman Aff. ¶5.)

18.     In managing the chemotherapy patient schedule, Site Manager must be in communication with both the physician leaders and the CSRs to ensure that patients and resources are matched appropriately throughout the day and to anticipate and promptly address any potential scheduling issues. (Diaz Dep. 104-105; Palatucci Dep. 29-30; Lopman Aff. ¶6.)

19.     Moreover, the schedule requires constant monitoring by the Site Manager to ensure that appointments slots are not under and/or over-booked, and to avoid cancellations and excessive wait times for patients who are generally in poor health and anxious about their treatments. (Lopman Aff. ¶6.)

20.     Initially upon her hire and until approximately December 2004, Ms. Diaz reported to Mr. Joe Loiacono, who then was an Administrator at the Center. (Diaz Dep. 62; Lopman Aff. ¶4.)

21.     In December 2004, Mr. Loiacono resigned his employment with the Center and Ms. Diaz began reporting directly to Mr. Abraham Lopman, who was Executive Director of the Regional Care Network. (Diaz Dep. 64, 91; Lopman Aff. ¶¶1, 4.)

22. Prior to Mr. Loiacono's departure and based upon the six months that he had supervised her, Mr. Loiacono completed Ms. Diaz's first (and only) performance appraisal from the Center. (Diaz Dep. 89-90, Ex. 10.)

23. In this appraisal, Ms. Diaz received an overall rating of "Meets Expectations," which corresponded to a numerical rating of 3.00 out of a possible 5.00. (Diaz Dep. 90, 93, Exs. 10, 11.)

24. The Center's performance appraisal contains five possible ratings (ranging from lowest to highest): "Unacceptable," "Below Expectations," "Meets Expectations," "Exceeds Expectations" and "Clearly Outstanding." (Diaz Dep., Ex. 10.)

25. Ms. Diaz received the lowest rating of the three Site Managers in the Regional Care Network who were supervised and evaluated by Mr. Loiacono. Specifically, the two other Site Managers received overall ratings of "Exceeds Expectations" and higher numerical ratings of 4.00. (Dudley Aff. ¶9.)

26. After Mr. Lopman began directly supervising Ms. Diaz, he noticed that she was having significant difficulty in managing the administrative operations, thereby compromising the facility's ability to appropriately care for its patients. (Lopman Aff. ¶7.) Most notably, Mr. Lopman observed significant problems with regard to the chemotherapy patient schedule. (Id.)

27. Some of the problems regarding the chemotherapy patient schedule included: (i) physician schedules were entered incorrectly, which resulted in patient appointments having to be cancelled and/or rescheduled; (ii) appointment slots were consistently overbooked, which resulted in patients being forced to delay the start of their chemotherapy treatments; (iii) patients were forced to endure lengthy wait times before their appointments; and (iv) patients were not

scheduled to see their regular physician. (Diaz Dep. 105, 109-11, 123, 126-30, Exs. 18, 19; Palatucci Dep. 12-13, 29, 33; Lopman Aff. ¶7.)

28. Moreover, problems with the chemotherapy patient schedule were being compounded by the fact that Ms. Diaz had failed to implement a uniform protocol with respect to the telephones, which resulted in patients having difficulty scheduling appointments and messages routinely getting lost. (Diaz Dep. 104; Palatucci Dep. 12-14; Lopman Aff. ¶7.)

29. Mr. Lopman also observed a lack of communication between Ms. Diaz and the physicians and nurses and an overall lack of leadership on the part of Ms. Diaz. (Lopman Aff. ¶7.)

30. Ms. Diaz admitted that these problems persisted throughout her employment and acknowledged that they had a negative impact on patient care. (Diaz Dep. 105-106, 109-111, 114, 122-23, 130.) In Ms. Diaz's own words, "patients [] weren't treated in the manner they should have been." (Id. at 122.)

31. Ms. Diaz further admitted that Mr. Lopman counseled her on several occasions about ways to better manage the facility, specifically with regard to being more strategic in managing the chemotherapy schedule. (Diaz Dep. 105-106, Ex. 17; Lopman Aff. ¶7.)

32. By March 2005, Ms. Diaz had failed to show any demonstrable improvement in her performance. (Lopman Aff. ¶8.)

33. Concerned about the direct negative impact Ms. Diaz's performance problems were having on patient care, and in an effort to improve her performance, Mr. Lopman asked Mr. Thomas Palatucci, who was a long-time Administrator at the Center, to go to Phelps a few days per week to offer Ms. Diaz support in performing her job. (Diaz Dep. 79-80; Palatucci Dep. 8-9, 31, 63-64; Lopman Aff. ¶8.)

34.     Mr. Lopman asked Mr. Palatucci to pay particular attention to helping Ms. Diaz learn to manage the chemotherapy patient schedule and the telephone system, which problems he perceived as having the most significant impact on patient care. (Palatucci Dep. 12-13; Lopman Aff. ¶¶7-8.)

35.     Upon Mr. Palatucci's arrival at Phelps, he observed significant problems with Ms. Diaz's management of the facility consistent with what had been described to him by Mr. Lopman. (Palatucci Dep. 13-15, 38-39.)

36.     In addition to problems with the chemotherapy patient schedule and the telephones, Mr. Palatucci also observed that the facility was constantly running out of supplies and that Ms. Diaz had a poor working relationship with several of the physicians and nurses. (Id. at 14-15, 22, 28.)

37.     From approximately March 2005 until September 2005, Mr. Palatucci provided on-site coaching and assistance to Ms. Diaz in an effort to correct her performance problems. (Diaz Dep. 79-80; Palatucci Dep. 8-9, 63-64; Lopman Aff. ¶8.)

38.     Despite Mr. Palatucci's best efforts, Ms. Diaz's performance failed to improve the area that was most critical -- the chemotherapy schedule. (Palatucci Dep. 25; Lopman Aff. ¶11.)

39.     Moreover, the physicians and nurses continued to voice complaints about Ms. Diaz's performance to Mr. Lopman. (Diaz Dep. 129-130, Ex. 19; Palatucci Dep. 28-29, 48; Lorant Dep. 42; Reyes Dep. 29; Lopman Aff. ¶10.)

40.     In September 2005, after six months of weekly on-site coaching and assistance from Mr. Palatucci, Ms. Diaz still failed to demonstrate that she could consistently perform her responsibilities as Site Manager at an acceptable level. (Palatucci Dep. 64; Lopman Aff. ¶11.)

41. Mr. Lopman could no longer afford to staff Mr. Palatucci at Phelps -- in essence, having two employees performing the duties of a single position. (Lopman Aff. ¶11.)

42. After consulting with Mr. Palatucci about Ms. Diaz's continued performance deficiencies and the impact such deficiencies were having on patient care, Mr. Lopman made the decision that Ms. Diaz's employment should be terminated. (Palatucci Dep. 19; Lopman Aff. ¶11.)

43. Before effectuating such termination, Mr. Lopman contacted Employee Relations to discuss the possibility of terminating Ms. Diaz's employment. Employee Relations confirmed that employees at Ms. Diaz's salary grade were covered by the Center's basic retirement plan and, thus, were not entitled to formal warnings in accordance with the PIP prior to their termination. (Lopman Aff. ¶12.)

44. On September 27, 2005, Mr. Lopman informed Ms. Diaz of her termination. (Id.)

45. Ms. Diaz complains of being treated in a belittling and unprofessional manner by Nurse Manager Ms. Lorraine McEvoy (Caucasian). (Diaz Dep. 43-46.) Specifically, Ms. Diaz points to a July 2005 disagreement that she had with Ms. McEvoy. (Id.) The incident arose after Ms. Diaz completed a proposed budget for the following year that included a recommendation to hire a new position at Phelps called a "nurse supervisor." (Id. at 44-45.) Upon reviewing Ms. Diaz's draft of the proposed budget, Ms. McEvoy interpreted the recommendation to hire a "nurse supervisor" as an attempt by Ms. Diaz to replace her. (Id.) In response to her interpretation of Ms. Diaz's draft, Ms. McEvoy yelled and cursed at Ms. Diaz in a belittling and unprofessional manner. (Id. at 43-44.)

46. Ms. Diaz concedes that Ms. McEvoy did not make a single comment about her race or color during the July 2005 conversation -- *or on any other occasion*. (Id. at 45-46.) Ms.

Diaz simply contends that Ms. McEvoy "implied it in her statement and her ranting and raving." (Id. at 46.)

47.     Ms. Diaz testified that Ms. McEvoy treated another employee -- Chief Therapist Helen Lorant (Caucasian) -- in the exact same belittling and unprofessional manner.  (Diaz Dep. 55-56; Lorant Dep. 25, 48.)

48.     Ms. Diaz and Ms. McEvoy were colleagues; Ms. McEvoy had no authority or input in the decision to terminate Ms. Diaz's employment, which decision was made exclusively by Mr. Lopman. (Diaz Dep. at 46-47; Lopman Aff. ¶11.)

49.     Ms. Diaz points to an alleged statement by one of the physicians to the effect of, "I don't know what you people are going to do, something needs to be done." (Diaz Dep. 160-62.) Ms. Diaz cannot even recall which physician made the alleged statement, identifying the speaker as simply, "Dr. Caron or one of the other doctors." (Id.)

50.     Ms. Diaz admitted that she has no idea who or what the term "you people" was in reference to, and that it could have been a reference to "African Americans" or to "administrative staff."  (Id. at 161.)  Ms. Diaz concedes that the statement occurred in the context of the physician discussing a work issue that was completely unrelated to her termination and inquiring as to how that issue was going to be resolved by the administrative staff. (Id.)

51.     Ms. Diaz did not report to Dr. Caron or any of the physicians, nor did they have any input in the decision to terminate her employment. (Diaz Dep. 162; Lopman Aff. ¶11.)

52.     Ms. Diaz complains that meetings attended by Ms. McEvoy, Dr. Caron and then-Medical Director Dr. Albert Casazza occurred without her approximately monthly during her employment at Phelps, but she can only identify one such meeting with any specificity. (Diaz Dep. 37.) Ms. Diaz admits that these were not standing or regularly scheduled meetings, that she

never inquired as to why she was not being included and that she has no personal knowledge of what was being discussed. (Id. at 37-38.) Moreover, Ms. Diaz was not a member of the clinical staff, such that these clinicians had a number of areas of responsibility for which Ms. Diaz could provide no input or assistance. (Id. at 73-74.)

53. Ms. Marie O'Brien was a CSR whom Ms. Diaz supervised and initiated the formal warning process for in accordance with the Center's PIP in 2004. (Id.) Ms. Diaz is not similarly situated to Ms. O'Brien because, unlike Ms. Diaz -- who at an M11 salary grade was not entitled to formal warning under the Center's PIP -- Ms. O'Brien was only at the C01 salary grade and, therefore, was entitled to formal warnings under the PIP. (Diaz Dep. 73-74; Dudley Aff. ¶8.)

54. Although provided a letter outlining her performance issues, the one document provided to Ms. Wilson was not a formal step in the Center's PIP because Ms. Wilson was not covered by that policy. (Diaz Dep., Ex. 7; Palatucci Dep. 54-55, 58-59, 62.) Moreover, prior to her termination, Ms. Wilson was *not* provided with multiple written warnings as set forth in the PIP because that policy was inapplicable to her. (Id.)

55. The Center afforded Ms. Diaz significantly more assistance with her performance deficiencies than was afforded Ms. Wilson. (Palatucci Dep. 31, 63-64; Lopman Aff. ¶8.) In this regard, Mr. Lopman assigned Mr. Palatucci to provide six months of on-site coaching and assistance to Ms. Diaz -- Ms. Wilson did not receive on-site coaching and assistance. (Palatucci Dep. 31, 54-55, 63-64; Lopman Aff. ¶8)

56. Ms. Wilson was ultimately terminated by Mr. Lopman for performance issues. (Palatucci Dep. 54, 59; Lopman Aff. ¶14.)

57. After terminating Ms. Diaz's employment, Mr. Lopman hired a Hispanic woman -- another minority employee -- as the new Site Manager at Phelps. (Lopman Aff. ¶13.)

Dated:  New York, New York
        January 18, 2008

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

By: /s/ Terri L. Chase
    Terri L. Chase (TC 9091)
    Katherine D. Kale (KK 7586)
    340 Madison Avenue
    New York, New York  10173-1922
    (212) 547-5400

*Attorneys for Defendant*
*Memorial Sloan-Kettering Cancer Center*

NYK 1141725-1.034164.0093

- 11 -