UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
SANDRA DIAZ,                                    :
                                                :
                        Plaintiff,              :
                                                :
            -against-                           :        **OPINION**
                                                :        06 Civ. 7718 (RLC)
MEMORIAL SLOAN-KETTERING CANCER                 :
CENTER,                                         :
                                                :
                        Defendant.              :
                                                X

APPEARANCES

Noah Aaron Kinigstein
Law Office of Noah A. Kinigstein
315 Broadway, Suite 200
New York , NY 10007
*Attorney for Plaintiff*

Dawn Jamie Groman
McDermott, Will & Emery, LLP (NY)
340 Madison Avenue
New York , NY 10017
*Attorney for Defendant*

Terri L. Ross
McDermott, Will & Emery, LLP (NY)
340 Madison Avenue
New York , NY 10017
*Attorney for Defendant*

**ROBERT L. CARTER, District Judge**

Sandra Diaz commenced this action against Memorial Sloan-Kettering Cancer Center ("Center") on September 26, 2006, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, the New York Executive Law § 296, and the Administrative Code of the City of New York § 8-101 *et. seq.*  The Center now moves for summary judgment on all of Diaz's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Center's motion is granted.

## BACKGROUND

On April 19, 2004, the Center hired Diaz as Regional Administrative Manager at its Westchester regional care facility in Sleepy Hollow, New York.  Diaz was responsible for overseeing and facilitating the administrative operations of the entire facility.  She also had certain responsibilities with respect to the facility's chemotherapy practice.  Specifically, she was responsible for, among other things, managing the chemotherapy patient schedule, a task that required her constant attention to ensure that appointments were properly managed, and to avoid cancellations and long wait times.

Diaz worked under the supervision of Joe Loiacono from April until December 2004.  Prior to his resignation Loiacono completed Diaz's only performance evaluation, giving her an overall rating of "Meets Expections," which corresponded to a numerical rating of 3 on a scale of 5.

When Loiacono resigned Diaz fell under the supervision of Abraham Lopman, the Executive Director of the Regional Care Network.  Lopman found that Diaz had

2

difficulty managing the chemotherapy schedule. Specifically, he found that she had problems correctly entering physician schedules, which resulted in having to cancel or reschedule appointments; problems managing appointment slots, which forced patients to delay their chemotherapy treatments; and problems ensuring that patients were scheduled to see their regular physician. Lopman also observed a lack of communication between Diaz, the physicians and the nurses, as well as an overall lack of leadership on the part of Diaz.

Lopman asked Thomas Palatucci, an Administrator at the Center, to offer Diaz on site support a few days every week. Lopman asked him to help Diaz learn to better manage the chemotherapy patient schedule and the telephone system. Palatucci worked with Diaz from March 2005 until September 2005. Nonetheless, Lopman found that Diaz failed to demonstrate that she could consistently perform her responsibilities at an acceptable level. He terminated her on September 27, 2005.

## DISCUSSION

I. Summary Judgment Standard

Summary judgment is appropriate where the parties' submissions demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the court must resolve all ambiguities and draw all inferences in favor

of the non-moving party.  Id. at 255.  The party seeking summary judgment bears the initial burden of showing that no genuine issue of fact exists.  Celotex, 477 U.S. at 323.  Once such a showing is made, the opposing party must present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

It is often difficult to apply summary judgment analysis in employment discrimination cases because they necessarily turn on the intent of the alleged discriminator, and plaintiffs will rarely uncover direct evidence of discriminatory intent.  Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989).  Nonetheless, a plaintiff must produce some evidence from which a reasonable inference of discrimination can be drawn.  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  For a plaintiff to survive a motion for summary judgment in a discrimination case, "she must offer 'concrete particulars' to substantiate her claim."  Duprey v. Prudential Insur, Co. of America, 910 F.Supp. 879, 883 (N.D.N.Y. 1996) (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

II.     Discrimination Claims

Title VII prohibits an employer from discharging any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. Sec. 2000e-2 (a)(1).  In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set forth the burden shifting framework under which Title VII and section 1981 discrimination

4

claims are analyzed.  Plaintiff has the initial burden of proving a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  To do so, Plaintiff must demonstrate that she is a member of a protected class; she satisfactorily performed the duties of her position; she was subjected to an adverse employment action; and the adverse action occurred in circumstances giving rise to an inference of discrimination.  Id.  If Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for her termination.  Id. at 802.  If Defendant succeeds on its burden, the presumption of animus "drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  Diaz then would have to show that the Center's reason is mere pretext and that discrimination was the true motivating factor for the adverse employment action.  Id. at 507-08.

III.  Prima Facie Case

     Diaz establishes all elements of a prima facie case, as she has offered evidence showing that she was terminated under circumstances giving rise to an inference of discrimination.  She was treated differently from a similarly situated, Caucasian colleague named Michelle Wilson.  Wilson was Diaz's homologue at the Memorial Sloan-Kettering New Jersey Foundation, was encumbered by some of the same problems, and was terminated in September 2007.  Before she was fired, Palatucci warned Wilson about her deficient performance in a July 9, 2007, letter outlining her problem areas.  By issuing the letter, Palatucci explained, he intended to put Wilson on notice that her performance was inadequate and needed quick improvement.  A similar formal admonition was never presented to Diaz.  This showing of disparate treatment of a

similarly situated employee enables Diaz to carry her *de minimus* burden.  See McLee, 910 F.3d at 134.

Since Diaz has presented a prima facie case, the Center must articulate a legitimate, non-discriminatory reason for terminating her.  It argues that she was terminated for poor performance, and provides admissible evidence that notwithstanding six months of weekly on site coaching and assistance from Palatucci, Diaz never demonstrated that she could consistently perform her responsibilities.

The Center has met its burden of production, and is entitled to summary judgment unless Diaz can point to evidence that reasonably supports a finding of discrimination. James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000).  She cannot.

First, Diaz argues that the nonpretextual reasons given for her termination are undermined by the racial biases she experienced at the Center.  She alleges several instances of discriminatory conduct.

Diaz contends that Drs Casazza and Caron, and Lorraine McEvoy, a nurse administrator, discriminated against her when they excluded her from meetings that took up issues she thought were pertinent to her role as Regional Manager.  Diaz alleges that she was excluded on account of her race.  Diaz admits, however, that she never inquired as to why she was not being included, and she admits to having no personal knowledge of what those meetings discussed.

This evidence is too speculative to support a finding of discrimination.  Diaz must cite "admissible evidence [showing] circumstances that would be sufficient to permit a rational finder of fact to infer that [the Center's] employment decision was more likely

6

than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128,138 (2d Cir. 2003) (quoting Stern v. Trustees of Columbia University in the City of New York, 131 F.3d 305, 312 (2d Cir. 1997)).  Instead she offers conjecture.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) ("unsupported allegations do not create a material issue of fact").

Diaz also recounts a July 2005 conversation with McEvoy about a controversial budget proposal, during which McEvoy yelled and cursed at her.  Although Diaz admits that McEvoy did not make reference to her race during the conversation, and that McEvoy had been comparatively gruff with another, Caucasian employee, Diaz supposes that McEvoy would not have treated her so rudely had she not been African American. Diaz also recounts a conversation with a physician whom she cannot identify, during which her interlocutor said, "I don't know what you people are going to do, something needs to be done."  (Aff. of Terri L. Chase, Esq. ("Chase Aff.") Ex. 1 at 40.)  Although Diaz explains that the conversation was about an issue at the Center, and she was unsure whether the speaker was referring to administrative staff, managers, CSRs, or African Americans, she supposes that the comment was racially discriminatory.

It is undisputed that Diaz did not report to Caron, Casazza or McEvoy, and that none had input in Lopman's decision to terminate her.  Generally, "[v]erbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff."  Silver v. North Shore Univ. Hosp., 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007) (citing Schreiber v. Worldco, LLC, 324 F.Supp.2d 512, 518-19

(S.D.N.Y. 2004)).  Diaz does not demonstrate any such nexus.  Furthermore, "[s]tray remarks by non-decision-makers . . . are rarely given great weight . . . ."  Campbell v. Alliance Nat'l Inc., 107 F.Supp.2d 234, 247 (S.D.N.Y. 2000) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).

Second, Diaz argues that the nonpretextual reasons given for her termination are undermined by evidence that she did not have performance issues.  But the record evinces otherwise and the evidence she proffers is wanting.  Diaz proffers the December 2004 evaluation from Loiacono that indicated that she had met expectations.  That Lopman's appraisal may have differed from Loiacono's is insufficient to show pretext.  See, e.g., Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F.Supp. 977, 988 (W.D.N.Y. 1996) ("[P]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual.  To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality.").  Diaz also proffers an August 2, 2005, email from Lopman that she construes as complimentary.  In the email, which was addressed to eight individuals and does not specifically refer to Diaz, Lopman wrote

> All, If you haven't done so, please look at the 2nd quarter 2005 patient satisfaction outpatient scores.  You can find them on the intra net under patient satisfaction.  Good job.  Although the Network continues to have some of the highest scores for MSKCC as a whole, there are a few areas with slight negative trends. Abe.

(Affirmation of Noah A. Kingstein ("Kingstein Affirm.") Ex. L.)  This mass email expressing diffuse, qualified approbation, without more, cannot enable a reasonable jury

to conclude that the Center's stated rationale for terminating Diaz is a pretext for racial discrimination, so it is not enough to create a triable issue of fact precluding summary judgment.  See, e.g., Van Zant v. KLM, 80 F.3d 708, 714 (2d Cir. 1990) (to defeat a motion for summary judgment the nonmoving party is "obliged to produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge") (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994)) (internal quotation marks and brackets omitted).  Finally, Diaz herself makes mention of problems that persisted during her tenure at the facility, in specific, problems surrounding chemotherapy patient scheduling (Chase Aff., Ex. 1 at 27) and physicians' schedules (Id. at 28).

       Third, Diaz argues that the nonpretextual reasons given for her termination are undermined by the Center's inconsistent application of its employment termination policy.  Diaz argues that Wilson's termination was prosecuted in compliance with the Center's Individual Performance Policy ("PIP") whereas hers was not.  The PIP implements a progressive discipline protocol for employees that involves of a series of graduated, formal warning procedures.  The PIP provides that "[if], in the Center's sole judgment, it is practicable to do so," (Kingstein Affirm. Ex. E at MSKCC 00808), the Center will offer the employee counseling, a verbal warning, a first written warning, and a final written warning before terminating her.  The PIP excludes those employees that participate in the Center's alternative, basic retirement plan, which covers management level employees, like Diaz and Wilson.  A review of the record supports the Center's

9

contention that Wilson was not treated in accordance with the PIP, as Palatucci's issuance of a solitary letter falls far short of the several, incremental steps the protocol requires.

## CONCLUSION

Diaz has failed to raise a genuine issue of material fact as to whether her termination was actually a pretext for racial discrimination. Defendant's motion for summary judgment is granted. Plaintiff's discriminatory termination claim is dismissed.

**IT IS SO ORDERED.**

DATED:   New York, New York
         November 18, 2009

_____
Robert L. Carter
United States District Judge